UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>DANIEL W. McELROY and )<br>AIMEE J. KING McELROY, )<br><br>Defendants. ) | Crim. No. 05-10019-RGS |

### UNITED STATES' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

The United States, by its undersigned counsel, opposes defendants' Renewed Motion for Judgment of Acquittal. Dkt. # 127. As set forth below, when viewed in the light most favorable to the government, *United States v. Callipari*, 368 F.3d 22, 43 (1st Cir. 2004), there was sufficient evidence for a rational jury to find beyond a reasonable doubt each of the essential elements of conspiracy, mail fraud, and procuring false tax returns as to both Daniel McElroy ("McElroy") and Aimee King McElroy ("King").

### ARGUMENT

Viewed in the light most favorable to the government, sufficient evidence existed for a rational jury to find that McElroy and King operated their temporary employment agency under the names Daily A. King Labor, Pro Temp Company and Precission Temp Corp and paid cash in order to evade millions of dollars in payroll taxes and workers compensation insurance premiums. Defendants base their Motion on a purported lack of "direct" evidence regarding an explicit agreement to defraud and the government's alleged failure to show that one or both of them engaged in specific conversations regarding their efforts to defraud the IRS and certain insurers. Def. Mem. at 1-2, 3, 5. Defendants further claim that Daily A. King's tax returns were accurate. *Id.* at 4-5. Their arguments ignore both the law and the evidence in this case.

Witness after witness testified that there was no meaningful difference between Daily A. King, Pro Temp and Precission Temp and that the defendants were the "bosses" of the company, regardless of the name. (Tr. 1/29 at 14, 15, 20-29, 31; Tr. 2/7 at 3-7, 68).[1] They had the same customers and the same employees.[2] The evidence showed that the defendants orchestrated a massive cash payroll system even though they had an automated payroll system that tracked payroll and cut checks. (Tr. 2/6 at 16; Tr. 2/7 at 19-51). The defendants continued to pay cash even after they were sued by the Department of Labor and specifically ordered to stop paying cash. (Tr. 2/6 at 32–37; Gov. Exh. 3).

Witnesses, including Marta Rodriguez, George Wallace, Dich Trieu, Xieu Van Son, Charles Wallace and Sotha Khuth, further testified that both McElroy and King were involved in the distribution of the cash payroll. Specifically, the evidence showed that King wrote checks to fund the cash payroll and occasionally handled the cash herself while McElroy accompanied the check cashers to the bank and counted and distributed the cash on a regular basis. (Tr. 2/7 at 7-9, 11-13, 23-24, 39, 46-57; Gov. Exhs. 410, 411A-F, 413A-D). King and her office staff also tracked the cash payroll on the "off the books" floppy disk system. (Tr. 2/1 at 16, 19, 22-33; Tr. 2/7 at 60-61; Gov. Exhs. 376A-C, 380A-C)).

---

[1] The transcript cites herein are to the testimony of George Wallace, Charles Wallace, and James Donahue as those transcripts were ordered during the trial.

[2] Michelle Farrar and Meredith Scanlan both testified that they worked in the office where Daily A. King, Pro Temp and Precission Temp were located. They testified that they tracked the payroll for Daily A. King, Pro Temp and Precission Temp and that they thought that the businesses were "the same." Farrar and Scanlan also were clear that McElroy and King ran the temporary employment agency. Likewise, Rick DeMello and Richard Donovan of On a Roll testified that Daily A. King, Pro Temp and Precission Temp supplied them with temporary labor, that McElroy held himself out as the boss no matter the name and that, from their perspective, there was no difference between the companies.

The evidence showed that, between 1994 and June 2001, the defendants' temporary employment agency paid more than $40 million in cash. (*See* Gov. Exh. 451). While they reported and paid payroll taxes on more than $60 million in check payroll, they did not pay payroll taxes on any of the cash. (*See* Tr. 2/7 at 77-78, 81; Gov. Exh. 452). They reported an even smaller payroll to the workers' compensation insurers. (Tr. 2/7 at 78-89, 92-94; Gov. Exh. 455). In short, there was sufficient evidence for a rational jury to conclude that the defendants operated the temporary employment agency, and continued to pay cash, in order to avoid paying payroll taxes and insurance premiums and to find the defendants guilty of all counts in the Indictment.

## I.    Sufficient Evidence Grounded the Jury's Finding of Guilt on the Conspiracy Count (Count 1).

Defendants' challenge to the jury's guilty verdict on the conspiracy count rests solely on their contention that there was insufficient evidence of an agreement to defraud the United States and their workers' compensation insurers. Def. Mem. at 1-2. Specifically, defendants argue that there was no "direct" evidence of an agreement. *Id.* at 1. Even assuming, for the sake of argument, that there was no such direct evidence, extensive circumstantial evidence allowed the jury to conclude that the defendants reached an agreement or "tacit understanding" (with each other, with their accountant Charles Wallace, and with others) to defraud the IRS and their workers' compensation insurers. As set forth above, the evidence showed that both McElroy and King participated in paying more than $40 million in cash to the employees of Daily A. King, Pro Temp and Precission Temp. Based on this evidence, it was rational for the jury to conclude that the whole reason for paying cash – even after the defendants were ordered not to, and even though they had the ability and in fact did pay some employees by check and reported that check

3

payroll to the IRS – was so that they could hide the cash payroll from both the IRS and their workers' compensation insurers.

Moreover, as set forth in the defendants' brief, Charles Wallace testified that he met with both defendants and specifically discussed how they could defraud the insurers by fabricating payroll documents and IRS Forms 941.  Def. Mem. at 2; (Tr. 2/8 at 45-46).  Some of those false documents were found in King's office during the search.  (Tr. 2/7 86-90; Gov. Exhs. 352A-E; Stipulation No. 18).  Likewise, Wallace testified that both McElroy and King told him the amount of premium they were willing to pay – which was less than the amount they would have had to pay had they disclosed their entire payroll.  (Tr. 2/7 at 82).  Finally, two insurance auditors testified that they met King and McElroy during payroll audits.  This and other evidence furnished more than a sufficient basis for the jury to conclude that the defendants conspired to defraud the United States and their workers' compensation insurers.

## II.    Sufficient Evidence Grounded the Jury's Finding of Guilt on the Mail Fraud Counts (Counts 2-4).

Defendants claim that there was insufficient evidence (1) that the three charged mailings were in fact mailed and (2) of their participation in a scheme to defraud, and specifically King's involvement in the scheme to defraud Pro Temp's and Precission Temp's insurers.

First, at trial, there was ample evidence of the mailings.  Michael Hayes and Joseph Dirico testified that it was the regular practice of their businesses to mail the specific mailings charged and admitted as Government Exhibits 207C, 228B and 229A.  As a matter of law, this testimony is sufficient to show that the charged mailings actually were mailed.  *See United States v. Gonzalez- Sanchez*, 825 F.2d 572, 588 n. 52 (1st Cir. 1987) (the use of the mails can be proven

4

through testimony concerning ordinary business practices); *United States v. Delfino*, 510 F.3d 468, 471 (4th Cir. 2007) (same).

Second, as set forth above, there was extensive evidence regarding both defendants' participation in an overarching scheme to defraud the workers compensation insurers that insured Daily A. King, Pro Temp and Precission Temp. King claims that, because Wallace testified that he did not have a specific conversation with her about Pro Temp's and Precission Temp's policies, the jury was irrational in finding her guilty of the mail fraud counts related to those two policies. Def. Mem. at 3. But Wallace testified that he specifically discussed the scheme to defraud their insurers – and ways to carry out the scheme – with *both* McElroy and King. (Tr. 2/7 at 82; Tr. 2/8 at 45-47). Moreover, despite the defendants' efforts to make it appear like Pro Temp and Precission Temp were separate businesses, the evidence showed that there was no meaningful distinction between them and that King helped run the business. *See supra*. Indeed, the computer evidence confirmed that, in addition to funding it, King personally tracked Pro Temp's and Precission Temp's cash payroll. (Tr. 2/1 at 16, 19, 22-23; Gov Exhs. 376A-C, 380A-C). As the jury found, both defendants were involved in the overall scheme to defraud workers' compensation insurers – regardless of which name appeared on which policy – and the evidence was sufficient to support that finding.

### III. Sufficient Evidence Grounded the Jury's Finding of Guilt on the Tax Fraud Counts (Counts 5-18).

Defendants challenge the jury's findings on the tax counts because, they claim, Daily A. King's returns were truthful and Wallace was responsible for filing Pro Temp's returns. Def. Mem. at 4-5.

5

The Indictment charged the defendants with procuring the filing of false IRS Forms 941 (Employers' Quarterly Returns) for Daily A. King and Pro Temp. In their Motion, defendants cite to testimony regarding deductions claimed by Daily A. King on its annual corporate return, or *Form 1120*, and argue that those returns were accurate. Def. Mem. at 4. Neither defendant was charged with filing a false 1120. The alleged accuracy of the Forms 1120 has no relevance to any of the charges in the Indictment.

With regard to the charges that were brought, Wallace testified that he did not report any of the cash payroll on either Daily A. King's or Pro Temp's Forms 941 and that those returns, thus, were false.[3] (Tr. 2/7 at 77-78, 81). Moreover, the testimony and documentary evidence established that both Daily A. King and Pro Temp employees were paid cash.[4] As set forth above, the government introduced evidence showing that McElroy and King ran the temporary employment agency, regardless of the name, and helped orchestrate the massive unreported cash payroll. Indeed, McElroy and King continued to pay cash even after being ordered not to and even though they had an automated check payroll system. *See supra.* Based on this evidence, it was reasonable for the jury to infer that McElroy and King paid cash in order to avoid paying taxes on that payroll and to find that they "knowingly" and "wilfully" procured the false Daily

---

[3] IRS Special Agent Joseph Guidoboni confirmed that the amounts included on the Forms 941 for both Daily A. King and Pro Temp tied out to the check payroll and that the additional cash payroll – which he calculated, for the most part, based on the checks cashed by Charles Wallace, Dich Trieu and Xieu Van Son – was not reported.

[4] Charles Wallace identified multiple Daily A. King customers that used temporary workers who were paid in cash. (Tr. 2/7 at 29). Mr. Wallace's testimony was corroborated by Michelle Farrar, Sotha Khuth and Dich Trieu, each of whom identified several Daily A. King "cash customers," including Sarah Michaels, J. Baker and Power It. Khuth further testified that the workers at those companies completed Daily A. King time sheets and were paid in cash. There was extensive testimony and documentary evidence showing, and defendants concede, that Pro Temp workers were paid in cash. (*See, e.g.,* Gov. Exhs. 314A-H; Tr. 2/7 at 19).

A. King and Pro Temp Forms 941. There was sufficient evidence to support the jury's finding that both defendants are guilty of Counts 5-18.

## CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Judgment of Acquittal should be denied.

                                                 Respectfully submitted,

                                                 MICHAEL J. SULLIVAN
                                                 United States Attorney

Dated: March 19, 2008

                                      By: */s/ Sarah E. Walters*
                                                 JONATHAN F. MITCHELL
                                                 SARAH E. WALTERS
                                                 Assistant U.S. Attorneys
                                                 John Joseph Moakley United States Courthouse
                                                 1 Courthouse Way, Suite 9200
                                                 Boston, MA 02210
                                                 (617) 748-3100

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

Dated:  March 19, 2008

                                          */s/ Sarah E. Walters*
                                          SARAH E. WALTERS